## MAYHUGH v. ROSENTHAL.

Geo. W. Mayhugh owned a house and lot in Cincinnati, January 1, 1856, when he left his wife and children in Cincinnati, and departed from the State of Ohio, and was not heard of from February 15, 1859, to October 15, 1868, when he returned home. On the 8th day of February, 1867, when he had been absent and unheard of for eight years, his wife and children conveyed the house and lot in Cincinnati in exchange for a farm in the country.

*Held*, in a suit by Mayhugh to recover the house and lot, that although his

Mayhugh v. Rosenthal.

absence, unheard from, for more than seven years was a ground for presuming his death, yet that presumption was only *prima facie* evidence of his death, and was rebutted by his return, and that the deed of his wife and children was void.

Upon the presumption arising from the seven years' absence, unheard of, the court of probate might have granted letters of administration of Mayhugh's estate and ordered a sale of his real property as of a deceased person, but his title could not be affected without legal proceedings.

The finding, on which the judgment of the court below was founded, was as follows, viz:

1. That Geo. W. Mayhugh, the plaintiff in case No. 24,037, was the owner in fee simple of the premises in question at the date of his departure from the State of Ohio, prior to January 1, 1856, and at the date of the reception of the last information from him, prior to his return therefrom, which last information was received at a date not later than February 15, 1859; that said Geo. W. Mayhugh never made any conveyance of said premises subsequent thereto.

2. That the defendants in No. 24,011, Clarissa A. Mayhugh, Benj. T. Mayhugh, and Chas. Mayhugh, on or about the 8th February, 1867, united in a deed of conveyance of said property to Jno. C. Robinson, plaintiff. The deed drafted by counsel, who represented both parties, described them as the owners thereof, the said Clarissa A. Mayhew as the widow, and said Benjamin and Charles as the heirs at law of said Geo. W. Mayhugh; said Clarissa A. Mayhugh stated to the plaintiff, Robinson, that her said husband had been absent from the State of Ohio more than ten years and unheard of more than seven years, and that he was dead and she believed him to be dead. Relying upon these statements, said Robinson purchased the property from said Clarissa, Benjamin, and Charles, taking a deed with covenants of seizin and general warranty.

3. Said Robinson took said property at the estimated value of $7,000, and paid therefor as follows: Conveyance to said Clarissa A. Mayhugh, at the request of said Benjamen and Charles, the premises described in the petition,

situated in Colerain township, subject to a mortgage of $4,600, and paying to her in cash $1,600, said Clarissa agreeing to pay said mortgage of $4,600. She bought personal property from Robinson and paid $90 out of the $1,600.

4. Said Robinson expended $460 in necessary and lasting improvements upon said Richmond street property, and sold the same to S. Rosenthal for $6,400, who was put into possession on or about the ——— day of ———, 1867, and has been in possession ever since.

5. Said Richmond street premises were worth a rental of $450 per annum.

6. On or about October 15, 1868, Geo. W. Mayhugh returned to Ohio, and subsequently instituted suit 24,037. He was ignorant of the sale until his return.

7. Said Geo. W. Mayhugh left no other property in the hands of his wife than the premises in question, and made no other provision for her support or that of his children, who were, at the time of his departure, aged respectively ten and twelve, excepting some remittances, the last of which was in a letter dated at Maysville, January 15, 1859, and postmarked February 12, 1859.

Since the return of said Mayhugh he has not lived or cohabited with his wife, nor visited her. He has done or suffered no act ratifying the sale of the lot on Richmond street, nor taken the possession of said property in Colerain township, nor done or suffered any act ratifying the possession of his wife and children of said property. No part of the proceeds of the sale of the Richmond street property has been received by him. Upon this agreed statement of facts, the court at Special Term rendered a judgment for defendant and dismissed the petition, to reverse which judgment this petition in error was filed.

*C. D. Coffin*, for Mayhugh.

*McGuffey, Morrill & Strunk*, for Rosenthal.

*Matthews, Ramsey & Matthews*, for Robinson.

TAFT, J.  The main question to be considered on this finding is, whether Geo. W. Mayhugh, by seven years' absence unheard of, lost the control of his real estate in Cincinnati, so that his wife and children could sell and transfer it without the interposition of a court.  Such an absence was *prima facie* evidence of his death.  Greenleaf's Ev., secs. 33, 41.  Acting upon that evidence, the wife and children undertook to convey the title of his real estate; and relying upon that evidence, Robinson took their deed, and paid a consideration for it by the transfer to them of a farm.  If the children and the wife had applied to the probate court for letters of administration they would have been granted, and an order of sale made on the application of the administrator would have been valid by the judgment of the court, and would probably have been conclusive as to the title conveyed.  *Newman* v. *Jenkins*, 10 Pick. 515, 516.

But, without any action of the court, it seems to a majority of the court that the title remained in Mr. Mayhugh, and could not be taken or conveyed away from him by his wife or his children.  The *prima facie* evidence of his death disappeared on his return alive to his home in Cincinnati. The presumption of death, arising from seven years' absence unheard of, is not absolute but *prima facie* only.  We find nothing in the text books or in the reports to sustain a stronger presumption than that.

Our attention has been called to the statement of a case which has recently arisen in Massachusetts, contained in an opinion of Mr. H. N. Sheldon, published in the October number of the American Law Register, 609, where, after an absence of the husband, unheard of, for more than seven years, the wife married again and lived with the second husband until he died.  The heirs of the second husband and the widow by mutual agreement settled the estate, assigning to her a portion of the property, and executing deeds mutually to each other.  After all this the first husband returned.  The heirs of the second husband sought to set aside the arrangement they had made with the widow, on

the ground that she was not the legal wife of the second husband.

Mr. Sheldon regards the arrangement as a fair compromise, and as such to be upheld. Nor does he think that the court would consider the validity of the marriage after the decease of the parties to it. This principle has been acted upon in several cases. *Campbell* v. *Corley*, 21 L. J. Mat. Cas. 60; *Crapsey* v. *McKinney*, 30 Barb. 47; *White* v. *Lowe*, 1 Redf. Sur. R. 376, and several other cases to the same effect. We think that the opinion of Mr. Sheldon, as expressed in the article referred to, would be found to be correct if it should come to a judicial decision. But it would not be an authority in this case, in which both husband and wife were living, and in which there is not the feature of a compromise of doubtful rights.

We can find no principle or precedent on which to sustain the validity of the sale and transfer of the real property of Mayhugh in his lifetime, without his consent or the interposition of a court.

The plaintiff, Mayhugh, is entitled to a judgment for the property, subject, however, to the right of Robinson, or the defendant, Rosenthal, to the benefit of the occupying claimants' law, in regard to the permanent improvements which have been put upon the premises by Robinson or Rosenthal.

Robinson, who purchased the property, and paid the consideration, partly in money and partly by the conveyance of a farm, has brought a suit against the sons and wife of Mayhugh, the plaintiff, and against Mayhugh, himself, for relief in respect to the consideration paid by him for the property in question.

As the last-mentioned case is not before us, we can not now decide what relief can be granted upon his petition.

The pendency of that case, however, furnishes no reason why the plaintiff in the present case should not recover his property. On the contrary, the final judgment in this case will furnish a basis of adjudication in that.

Judgment will be entered in favor of the plaintiff as already indicated.

STORER, J., dissentiente.

These actions, by consent of parties, have been tried upon the same evidence, and as they involve a common principle, they should be together determined upon the facts submitted to the court.

The testimony, as well as the admissions of the parties, are not in conflict, but, on the contrary, leave us in no doubt of the existence of these prominent facts:

*First.* That Mayhugh was living with his wife and children in Cincinnati in the autumn of the year 1856, and that he owned, in fee simple, a dwelling house and lot of the value of $5,000, which was occupied as the family mansion.

*Second.* Late in that year, and without any apparent cause, the husband left the city, providing no means for the support of his wife and children, other than the rental of the house in which they lived.

*Third.* On the 1st day of March, 1859, a letter was received by Mrs. Mayhugh from her husband, inclosing a small remittance. This letter purported to be written from Marysville, California.

*Fourth.* From that time until 1868, when Mayhugh made his appearance in Cincinnati, he had not been heard from by his wife or any one of his children, though they had meanwhile made every inquiry for his residence, and had written to the place from which he had dated his letter, but no information concerning him could be obtained. In the interim, Mrs. Mayhugh supported herself, educated her sons, and provided their living from the rents of the house, aided by her needle work.

*Fifth.* In the month of February, 1867, more than seven years after the husband had been heard from by the wife or her children, and supposing him to be dead, it was proposed by Mrs. Mayhugh and her children, one of whom had arrived at his majority, and the other would soon be of full

age, to exchange the house and lot with Robinson for a farm in the country. This negotiation ended in a transfer, by Mrs. Mayhugh and her sons, of the Cincinnati property to Robinson, and a conveyance by him to them of the country property.

*Sixth.* The terms of the exchange were upon a valuation of $7,000 for the city property, and $10,000 for the farm, a mortgage then resting upon the latter for $4,600, to be paid by the grantees—Robinson agreeing to pay $1,600 in cash, to make the exchange equal. That sum was paid accordingly, and possession taken by Robinson of the house and lot in the city, and by Mrs. Mayhugh and her children of the farm.

The contract seems to have been fairly made, and the exchange mutually beneficial to the parties. Deeds with warranty were reciprocally executed, delivered, and recorded.

After this agreement had been made, a year and more intervened when the husband returned to Cincinnati, but has not since resided with his family. He now brings his action to regain the possession of the city property from the defendant, Rosenthal, who had in good faith purchased it from Robinson and paid the purchase money. This is the suit already referred to, which we are to determine, with the other brought by Robinson against Mayhugh, in which Mrs. Mayhugh, her children, and Rosenthal are joined as parties. The object of this last suit is to obtain all the equitable relief that should be granted, either by the abrogation of the exchange referred to, by restoring, if the court should so determine, the city property to the husband, and the farm to Robinson, leaving him to make good his covenants to Rosenthal.

The questions which arise for decision on these facts are alike interesting and novel.

Before the passage of the statute of 1 Jas. II., chap. 1, sec. 2, relative to leases for life, and that of 19 Car. II., chap. 6, relative to bigamy, there was no settled rule as to the period of time that should elapse before the presumption of death

could be allowed. By the civil law the limitation was one hundred years, in case of absent persons; "*quia id finis vitæ longævi hominis est;*" and Swinburne, in pt. 6, p. 445, of his work on Wills, tells us the views of writers on the continent were conflicting—some claiming seventy years, the "three score and ten" of the Psalmist; others still contending a century must have first expired. Subsequently, we find the established term was deemed to be unreasonably long, and became shortened by custom and statute, until the period of three, five, seven, nine, and ten years was adopted in various countries. *Engle* v. *Emmet*, 4 Bradford, 119.

An inroad was thus made upon the ancient doctrine, by the statutes referred to, which fixed the period of absence in both cases to seven years, enabling the husband or wife, who came within the provisions of the law, to marry again after the period referred to, if no knowledge of the death or life of either existed, and so of the right of the lessee for life, if the same fact appeared. This is now the established law in England.

Thus, "where there is proof of a party's continuous unexplained absence, and the non-receipt of intelligence concerning him in such cases, after the lapse of seven years, the presumption of life ceases, and the burden of proof devolves on the other party." Taylor on Ev., sec. 157.

This period, the same author tells us, was inserted in the statutes referred to upon great deliberation, and has since been adopted by analogy in other cases. A review of the decisions in the English courts upon the point would occupy too much space in our opinion, and we need not quote them at length, as they are all in harmony with each other.

We may, however, select a few. In *Doe* v. *Jesson*, 6 East, 80, Lord Ellenborough said: "The presumption of the duration of life, with respect to persons of whom no account can be given, ends at the expiration of seven years from the time when they were last known to be living." And so in *Hopewell* v. *De Pinna*, 2 Campbell, 113, the same judge holds that "a woman pleading coverture was bound to prove her

husband was living within seven years next preceding her plea."

The same decision was made in *Doe ex dem., Loyd* v. *Dukin*, 4 Barn. & Ald. 434, and 5 Barn. & Ald. 86. See also 1 Williams on Executors, 274.

This is the rule, also, so far as we can ascertain it, which prevails in the courts of the United States.

In *McCarter* v. *Carnel*, 1 Barb. Ch. 46, Chancellor Walworth reviews the cases, and has no hesitation in adopting the limitation of seven years. See also the Vice-Chancellor's opinion, in *Oppenheimer* v. *Wolf*, 3 Sandf. 573, where the loss of the steamship President and her passengers was presumed, and the same limitation of time clearly stated to authorize the presumption. See also *Engle* v. *Emmet*, already quoted, in which there is furnished us a most thorough investigation into the reason and propriety of the rule.

The same limitation is adopted in the Supreme Court of Massachusetts, in *Newman* v. *Jenkins*, 10 Pick. 515.

And the question has been authoritatively adjudicated by the Supreme Court of Ohio, in *Rice* v. *Lumley*, 10 Ohio St. 596, where it is said "if a man leaves his house or usual place of residence and goes to parts unknown, and is not heard of or known to be living for the period of seven years, the legal presumption arises that he is dead." This would seem to be the same language used by Chief Justice Shaw, in *Loring's Adm'r* v. *Steiman*, 1 Met. 204, where he ably discusses the doctrine. See also 1 Greenl. on Ev., sec. 47.

If, therefore, I have correctly stated the legal proposition, I may ask what was the condition of the parties when the deeds of exchange were made between them?

It is evident the term required to raise the presumption of death had fully transpired, and the most perfect good faith attended the entire transaction from its commencement to its final consummation.

Mrs. Mayhugh might have applied for her dower, making her children, the only heirs of her husband, parties to the

action; she might have taken out letters of administration and obtained an order to sell the estate; she could have sought, and might have been granted, a divorce on the ground of the willful absence of her husband. She was absolved from her existing marital engagement so far as to authorize a second marriage, and would have been protected from all the penalties of bigamy. If she had been divorced, alimony would have been allowed her, equivalent, I think, to the full value of the property her husband owned. Should she have availed herself of either of these privileges, the action of the tribunal which secured them would have been final. Having jurisdiction over the subject, and the only parties who in contemplation of law could object, whatever was judicially decreed, the proceedings could not have been collaterally impeached by the husband on his return after so long an absence.

. The doctrine as to the finality of the probate of a will is discussed with great ability by Buller, J., in *Allen* v. *Dundas*, 3 T. R. 129, where it was held by that eminent jurist, sustained by his colleagues, Ashurst and Grose, "that a probate, as long as it remains unrepealed, can not be impeached in the temporal courts, no matter whether the will probated was forged or not; and all acts performed while the probate is unreversed protect the executor as well as those who receive his acquittance for debts due the testator." This case was decided in 1789, but previously, as early as 1749, Lord Chancellor Hardwicke had affirmed the same principle in *Barnsby* v. *Powell*, 1 Ves. 287.

See also Williams on Executors, 451 to 462; *Westcott* v. *Cady*, 5 Johns. Ch. 343; and the opinion of Ch. J. Shaw, in *Loring's Adm'rs* v. *Stieman et al.*, 1 Met. 244, already referred to. Our own courts have recognized that the principle applicable to the judgments and decrees of every tribunal competent to adjudicate the subject matter, extends equally to the granting letters of administration, or permitting probate of a will. *Ex'rs of Bigelow* v. *Bigelow*, 4 Ohio,

138; *Bayless* v. *Bayless*, 8 Ohio, 239; *Hall* v. *Ashby*, 9 Ohio, 96. To the same point is the ruling in *Rayland* v. *Green*, 14 S. & M. 194.

If, then, so far as the wife was concerned, her acts confirmed by a competent court, would confer title upon a purchaser, and protect her from personal liability, what was the position of the husband after his return? Could he demand, as a matter of course, his marital rights, or be restored to the possession of what was once his estate?

When actual evidence of death exists, there is no difficulty in permitting those upon whom the estate falls to exercise their legal rights. But there are many cases where such testimony can not be had to establish what one may well believe is true, while there is yet wanting the positive assurance to justify it, and from the very nature of the fact to be proved, no other or better evidence than presumption can be obtained. Such especially is that which we may infer from a long unexplained absence, implying as it must either death or permanent abandonment. If no limit was, therefore, fixed to authorize this natural conclusion, there would be no settlement of estates; the heir might be indefinitely postponed; the widow be required to live upon " hope deferred," until the ancient rule of the lapse of a century shall have intervened, thus ignoring the rights of parties until new generations have appeared to represent the estate, when it would be difficult to say where it was vested meanwhile—in the dead or the living, or was really " *in nubibus.*"

To remedy such a state of things, and establish a rule which changes the presumptive into the actual, we are permitted to hold, after the lapse of seven years, as a fact proved, that a person is dead who has not in the interval been heard from by his family, no matter whether he has absented himself in foreign lands or beyond the Rocky Mountains. The object of this new established canon in the law of evidence is to regard the fact as actually proved after the limitation has been reached; and after a diligent examina-

tion of the cases, I can find no instance where the owner of an estate has been allowed to resume his possession, after the presumption of his death legally exists, if the heir or the widow, acting upon that presumption, have asserted their relative rights and conveyed away the estate.

When the strongest presumption of death exists, the mere possibility of life is not to be taken into the account; there can be no legal resurrection.

This view of the law is but the application of the same principle where the existence of grants is presumed; on which statutes of limitation are enacted, guilt or innocence in criminal cases inferred, the adjudications of courts sustained their findings upon the subject matter before them, implying *ex necessitate*, " *Omnia bene et rite sunt acta.*"

All the parties to this controversy are now before us, and it is our duty, in administering their several equities, so to determine that there shall be no failure of justice, no wrong done to any.

We may assume " *in limine* " that there was, on the part of the husband, a virtual abandonment of his family. There was no excuse, no palliation for his conduct during his long absence. He could at any time have communicated with his wife, at least by letter, as the mails were regularly carried from the Pacific coast to every part of the United States. He knew what slender means were provided for the maintenance of those he was morally and legally bound to support. Above all, he knew that the care of his sons, growing up to manhood, rested entirely with the mother. The father was willing no longer to aid in the discharge of so responsible a duty, but, on the contrary, in all the responsibilities of a parent, he was estranged from those he was under the most solemn obligations to honor and protect.

If he had refused or neglected to provide for the support of his family, and his personal liability could not be reached in consequence of his absence, there must be some

remedy for those he had abandoned, by which his property could be substituted for his person.

Mrs. Mayhugh being the only parent to whom the sons could look for support, neither they nor their mother could be required to pay taxes, insurance, or repairs from the small rental of the property, and thus become the mere servants of the husband and father; or to uphold his estate, at the sacrifice of the mother's health from hard work, or the every-day toil of her sons, so that when the father should return, whether at the end of seven or twenty years, he might enter upon the possession and compel an account of the rents.

I can not admit such a result, when we are bound so to administer the law that the husband's estate shall be charged with the maintenance of his wife and children, and the education of the latter also.

I am satisfied Mrs. Mayhugh might, after the presumption of her husband's death had legally attached, with the aid of her sons, have raised money by a mortgage upon his estate, and appropriated it to the purposes I have indicated. If she was then a *femme sole*, she was competent to contract, and a repentant returning husband could not complain that she and his children had done that indirectly which he was obliged to do directly. Before he could reclaim his property, he ought to discharge the incumbrance created for the special purpose of effecting the object he was by every principle of justice, every duty devolving on him as a husband and a father, bound to have performed, and which, if performed, would have secured his estate from embarrassment, and those who were so near to him from mortification, as well as the sense of dependence. Whenever a wife is driven from her husband's house by his brutal conduct, whether by actual violence or such behavior on his part, morally speaking, as essentially defeats the marriage relation, or if the husband voluntarily leave the family domicile, neglecting to provide for the support of his household, he virtually gives a credit to those who

have a claim upon him as a husband and father, which in
every proper case will be charged upon him or his estate,
should he have abandoned his home. This liability can
not be denied by him upon whom it legally rests, if it is
sought to be enforced by a stranger who may have fur-
nished to the wife and children the means of their sup-
port, or by their direct application, if made for relief, by
charging the husband's property.

This general principle may well authorize that to be
done which was done in the case before us.

This view is in harmony with the doctrine settled by the
judges in Wayland's case, early in the reign of Henry IV.,
which is largely quoted by Lord Coke in his Commenta-
ries, vol. 1, sec. 200, p. 132 *b*, tit. Villeinage. There it was
held, when the husband abjured the realm, was banished,
or went voluntarily into exile, his wife became a *feme
sole*, the *baron* being regarded as civilly dead. Chancel-
lor Kent quotes this decision, with the annotations of Coke,
without objection, and refers to the more modern rulings
of the English courts on the same point, as that of *Deerly*
v. *Duchess of Mazarine*, 1 Salk. 116, and Lord Raymond,
147; *Walford* v. *Duchess of Pienne*, 2 Esp. N. P. 554; *De
Gaillon* v. *L'Aigle*, 1 B. & P. 357; *Kay* v. *Duchess of
Pienne*, 3 Camp. 123.

How far the American courts have sustained the princi-
ple we may readily learn from the cases to which we now
refer. The Supreme Court of Massachusetts, in *Gregory*
v. *Paul, Ex'r*, 15 Mass. 31, in an elaborate opinion delivered
by a most able judge more than fifty years ago, cited Way-
land's case with approbation and applied it to the case be-
fore them. This was where a husband deserted his wife
in a foreign country, and she afterward maintained herself
as a *feme sole*, in the United States, for five years, and she
was there held to be regarded as a single woman. The
judge—Putnam—stated clearly what was the effect of exile,
abjuration, or banishment:

"The wife might claim dower as a widow. She

might alien her land without her husband. She is excepted from the disabilities of coverture. She may maintain trespass, sue for her jointure, make her will, and in all other things act as if her husband were dead."

" Miserable, indeed," said the judge, " would be the situation of those unfortunate women whose husbands have renounced their society and country, if the disabilities of coverture should be applied to them while thus deserted."

" The case at bar," continues the court, " comes within the spirit of the rule of the common law, founded on reason and necessity in cases of exile and abjuration, and the wife has the right to acquire property and be permitted to sue and be sued as a *feme sole*."

In *Abbott* v. *Baylcy*, 6 Pick. 89, Chief Justice Parker pronounced the same doctrine in a case very similar.

And subsequently, in *Gregory* v. *Pierce*, 4 Met. 478, Shaw, C. J., after recapitulating the facts in the case, affirmed the previous rulings of the court, saying : " To accomplish this change in the civil relations of the wife, the husband's absence must be absolute, and complete ; it must be a voluntary separation from and abandonment of the wife, embracing both the fact and the intent of the husband to renounce *de facto*, and as far as he can do it, the marital relation, and leave his wife to act as a *feme sole*." Again : " The fact of desertion by a husband may be proved by a great variety of circumstances tending, with more or less probability, to that conclusion;" and among these he included, " absence for a long time, not being necessarily detained by his occupation, or business, or otherwise."

A similar conclusion is arrived at by the Supreme Court of South Carolina, in *Bean* v. *Morgan*, 4 McCord, 148, who quote with approbation the rule laid down by Clancey, in his Rights of Married Women, pp. 7–13 : " If the husband depart from the realm for the purpose of residing abroad, either voluntarily without an intention of returning, or is compelled so to do without the privilege of returning, such absence renders the wife capable of contracting, and

therefore of ability to sue and be sued, and to acquire and dispose of property as if she were *sole*."

The same doctrine was admitted very fully in *Chapman et al.* v. *Lemon et ux.*, 11 How. Pr. 235.

In the late case of *Osborn* v. *Nelson*, 59 Barb. 37, decided the present year, the Supreme Court of New York affirmed the rule to its fullest extent. They say: " The husband did not go beyond the limits of the United States, it is true, but he went to California, and has never since returned to this State or his family, and this is equivalent to abjuring the realm by the husband, at common law, so as to enable the wife to sue and be sued."

On the same principle, the case of *Wagg* v. *Gibbons*, 5 Ohio St. 580, is to be sustained.

I have said the abandonment by the husband, if it necessitate the same result as would follow his abjuration, exile, or banishment at common law, works his civil death, and the separation between the parties is complete. . See *Robinson* v. *Reynolds*, 1 Vermont, 174, where the cases upon the effect of what the law terms " civil death " are examined and reviewed.

When one is civilly dead he is unknown to the law. His will, at common law, could be probated, his property divided among his heirs or devisees, and it seems legitimately to follow that in such a case as where a husband abandons his wife and children to their individual rights and obligations, he is no longer to be recognized in his conjugal and paternal relation.

It is true the power of no court has been invoked to aid the parties, but in its stead an exchange of property was made more beneficial to all concerned. A farm in the neighborhood of the city was secured, with substantial improvements, containing sufficient land for tillage, where a comfortable living might be earned from its cultivation. The price at which it was estimated was fair, and there was an immediate change of possession when the conveyances were made. In fact, the city property has merely changed

its name—its value is not practically impaired—and yet the absent husband, with all his delinquencies, neglect, and indifference toward his family, now seeks to recover the city property, without the grace of offering to release the country farm.

Such an experiment, if successful, would ensure to him all the estate he left when he abandoned his family, leaving them to indemnify Robinson and Rosenthal on their covenants of warranty, while the farm will be retained by the family, for which no consideration has been given.

It is clear the wife could not resist her liability on her covenants on the ground of alleged coverture, as she would be required, in such a case, to prove her husband was alive within seven years preceding his return. *Hopewell* v. *De Pinna*, 2 Camp. 113. The question resolves itself at last into this: Was the exchange made by Mrs. Mayhugh and her sons void, or merely voidable? If the latter, and I think no more can be claimed, the husband must place the parties who claim under his wife and children *in statu quo*. He can not be benefited at the expense of others who acted honestly in the matter, and whose rights, to the fullest extent, we are bound to protect.

This view of the case does no injustice. The wife and children, having invested the fund to which they were equitably entitled for their support, in the property, still retained for their benefit, they ought not, in my opinion, to be deprived of its ownership at the instance of the husband, who had forfeited all claim to the estate by inexcusable absence, I should say voluntary abandonment, until it might have been presumed, upon the soundest principles of evidence, he was no longer alive.

The statute of limitations will run in Ohio against a non-resident, when no other ground than adverse possession intervenes, as we recognize no such exception as absence "beyond seas" to save the bar, and may we not ask if the spirit of that rule does not apply in its highest sense in a

case like this, where there was not only occupation, but a legal right to uphold it?

I am satisfied, from a careful review of all the facts connected with this case, that the plaintiff, George Mayhugh, ought not, either in law or in equity, to be permitted to sustain his action, and we should therefore give judgment for the defendant.